# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| OVERSEAS HARDWOODS COMPANY, INC., <br> Plaintiff, <br><br> v. <br><br> HOGAN ARCHITECTURAL WOOD PRODUCTS, LLC, a/k/a HOGAN ARCHITECTURAL HARDWOODS LLC; M. DAVID HOGAN; BRENT UPSHAW; and BLAKE OGILVIE, <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 19-00191-N <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## ORDER

This action came before the Court for a nonjury trial held on November 2, 2020 through November 3, 2020 at which the claim alleged by Overseas Hardwood Company, Inc. ("OHC") against Defendants Blake Ogilvie ("Ogilvie") and Brent Upshaw ("Upshaw") was tried. Upon consideration of the arguments and evidence presented at trial, the parties' post-trial briefs (Docs. 113, 115), and all other pertinent portions of the record, the Court makes the following findings of fact and conclusions of law.

### I. Procedural History

OHC initiated this action by filing a complaint against Defendants alleging fraud, with the latter subsequently removing the suit to this Court. (Doc. 1-1, modified by Doc. 22). As set forth in the Joint Pretrial Document (Doc. 103), OHC's sole claim for relief is that Ogilvie and Upshaw committed fraud by intentionally misrepresenting their business relationship with Hogan Architectural Hardwoods,

LLC ("HAH") to induce OHC to extend more credit to HAH. Ogilvie and Upshaw deny any wrongdoing, arguing in the alternative that (1) they did not make any statements to induce reliance; (2) any reliance would have been unreasonable; and/or (3) their actions substantially complied with their representations.[1] Prior to trial, Defendants moved for summary judgment (Doc. 91), but the Court denied the motion after full briefing (Doc. 100).

## II. Findings of Fact

The claim in this case arises from a meeting at the Stagecoach Inn in Stockton, Alabama on June 27, 2018 between Ogilvie, Upshaw, and David Hogan ("Hogan") from HAH, and OHC's representatives: Luckett Robinson, Joey Skinner ("Skinner"), and Gregory Robinson. (Doc. 110, PageID.992). Luckett Robinson is OHC's Vice President of Finance, General Counsel, and chief credit decision maker. (Doc. 110, PageID.978–79). Gregory Robinson is OHC's Vice President of Operations, and Skinner is an OHC salesman. (Doc. 110, PageID.992). The purpose of the meeting was to discuss Ogilvie and Upshaw's purported equity investment in HAH. (Doc. 110, PageID.994).

---

[1] The triable issues of law and fact joined in this matter are confined to those delineated in the Joint Pretrial Document (Doc. 103), as incorporated in the Pretrial Order (Doc. 107). To the extent that any party argues for adjudication in its favor of a triable claim or defense not identified in the Joint Pretrial Document, that argument is rejected because, as the Court previously explained, the Joint Pretrial Document "shall constitute the final statement of the issues involved in this action, govern the conduct of trial, and form the basis for any relief afforded by the Court." (Doc. 107, PageID.951).

At the meeting, Ogilvie and Upshaw outlined their business experience and explained how they benefit HAH's operations. (Doc. 110, PageID.995). Luckett Robinson then directly asked Ogilvie and Upshaw how much cash they had invested in HAH. (Doc. 110, PageID.995). Ogilvie and Upshaw responded that they each had invested $125,000. (Doc. 110, PageID.995; Doc. 110, PageID.1110–11). Following this exchange, Luckett Robinson asked Hogan about HAH's present ownership split. (Doc. 110, PageID.995). Hogan explained that he owned 55% of HAH, his father owned 25%, and Ogilvie and Upshaw each owned 10%. (Doc. 110, PageID.995). Ogilvie and Upshaw further represented to Luckett Robinson that they had contributed $50,000 worth of equipment to HAH to improve its lumber processing capabilities. (Doc. 110, PageID.996). As a result of Ogilvie and Upshaw's representations at this meeting, OHC continued to sell lumber to HAH on credit. (Doc. 110, PageID.997–98).

OHC's representatives and Defendants offer conflicting testimony about whether these statements were made at the Stagecoach Inn meeting. However, the evidence introduced at trial supports the testimony of OHC's representatives that Ogilvie and Upshaw did purport to have an ownership interest in HAH as a result of their substantial capital contributions:

- On May 16, 2018, David Hogan emailed Luckett Robinson that he had taken on "two equity partners." Pl.'s Ex. 4. Upshaw was copied on this email and did not dispute this characterization. Pl.'s Ex. 4. In response, Luckett Robinson agreed to sell lumber to HAH on credit while expressing a desire to meet and discuss HAH's plan for repaying its debts to OHC. Pl.'s Ex. 4. The exchange

precipitated the parties' June 27, 2018 meeting. Pl.'s Ex. 4; (Doc. 110, PageID.991–92).

- Shortly after the June 27, 2018 meeting, HAH sent out a press release with the following statement: "Founder David Hogan from Hogan Architectural Hardwoods (Lafayette, LA) has partnered with Blake Ogilvie and Brent Upshaw of BoBu Holdings (Bossier City, LA) to expand and modernize Hogan Architectural Hardwoods." Pl.'s Ex. 10. The release also described the business strategy and future of HAH as envisioned by Hogan, Ogilvie, and Upshaw. Pl.'s Ex. 10.

- Upshaw made further statements to Luckett Robinson after OHC extended HAH's line of credit, claiming that HAH was profitable and that the company would soon make payments on its debt. (Doc. 110, PageID.1009–10). Upshaw also placed lumber orders with OHC on behalf of HAH. (Doc. 110, PageID.1139–40).

- Both Ogilvie and Upshaw had HAH email addresses: bogilvie@hoganarchitectural.com and bupshaw@hoganarchitectural.com. Pl.'s Ex. 9. Upshaw used this email address to contact Luckett Robinson on the day after their June 27, 2018 meeting at the Stagecoach Inn regarding a proposed partnership between HAH and OHC. Pl.'s Ex. 9. Ogilvie and Hogan were copied on this email via their HAH email addresses. Pl.'s Ex. 9.

Ogilvie and Upshaw made false representations to Luckett Robinson about their involvement with HAH during the June 27, 2018 meeting. By Ogilvie and

4

Upshaw's own admission, they never invested $125,000 into HAH nor did they acquire any ownership interest in the company. (Doc. 111, PageID.1290; Doc. 111, PageID.1349). Rather, Ogilvie and Upshaw invested over $250,000 into Louisiana Lumber & Timber, LLC ("LL&T") in the form of cash, guaranties, and in-kind services. (Doc. 111, PageID.1290; Doc. 111, PageID.1349). However, the only actual cash invested by Ogilvie and Upshaw was $40,000 from their entity "BOBU Holdings" into LL&T. (Doc. 111, PageID.1290; Doc. 111, PageID.1349). While Upshaw and Ogilvie intended to establish LL&T to benefit HAH without assuming any ownership interest in HAH (Doc. 111, PageID.1218), the particulars of their actual involvement with HAH was not disclosed to OHC's representatives while the credit relationship existed. (Doc. 110, PageID.1016).

Ogilvie and Upshaw's representations at the June 27, 2018 meeting induced OHC to further extend its line of credit to HAH. The purpose of the meeting—OHC's need to clarify HAH's credit situation—was explicitly stated in the email exchange between Hogan and Luckett Robinson setting up the meeting. Pl.'s Ex. 4. Upshaw was copied in this email exchange. Pl.'s Ex. 4. Further, Luckett Robinson directly asked both Ogilvie and Upshaw about their investment in HAH as well as any ownership interest they may have. (Doc. 110, PageID.995). After Ogilvie and Upshaw claimed to have invested $250,000 and equipment into HAH in exchange for a combined 20% ownership interest, Luckett Robinson decided to extend HAH's line of credit. (Doc. 110, PageID.995–96). Luckett Robinson testified that if not for these

5

representations, OHC would not have extended its line of credit to HAH. (Doc. 110, PageID.997–998).

Prior to May 2018, HAH had generally fulfilled the terms of its credit agreement with OHC. (Doc. 110, PageID.982; Doc. 110, PageID.1107–08). While HAH did not always pay on time, late payments are commonplace in the lumber business. (Doc. 110, PageID.1023–24; Doc. 110, PageID.1108). Further, Upshaw explained to Luckett Robinson that the slow payments from HAH were the result of delayed collection of funds from its new—and expanding—customer base. (Doc. 110, PageID.1009–10). After its line of credit was extended, HAH purchased $276,215.28 worth of lumber from OHC between July 18, 2018 and September 6, 2018. Pl.'s Ex. 31. HAH did not, and has not, paid OHC for this lumber. (Doc. 111, PageID.1361). With HAH's debt mounting, and without any new payments credited on its existing debt, OHC discontinued its credit sales to HAH in September 2018. Pl.'s Ex. 31; (Doc. 111, PageID.1358).

### III. Conclusions of Law

OHC's sole claim against Ogilvie and Upshaw is fraud. In order to prove fraud, OHC must establish that Ogilvie and Upshaw (1) made a false representation, (2) of a material existing fact, (3) that it reasonably relied upon, and (4) it suffered damage as a proximate result of the reliance. *See Waddell & Reed, Inc. v. United Invest. Life Ins. Co.*, 875 So. 2d 1143, 1160 (Ala. 2003). OHC must prove these elements by a preponderance of the evidence. *See Ex parte Gradford*, 699 So. 2d 149, 152 (Ala. 1997)

6

(noting that the standard of proof in a civil case is generally preponderance of the evidence).[2] The undersigned finds that OHC has met this burden.

A. False Representation

Ogilvie and Upshaw made false representations to OHC during the June 27, 2018 meeting at the Stagecoach Inn regarding their relationship with HAH. Luckett Robinson's credible testimony, as well as testimony from Gregory Robinson and Joey Skinner, establish that Ogilvie and Upshaw clearly represented that they had each invested $125,000 in cash as well as $50,000 worth of equipment into HAH in exchange for a combined 20% ownership interest. The circumstantial evidence in this case—from Ogilvie and Upshaw's interactions with Luckett Robinson after the June 27, 2018 meeting to the public statements made about the pair's relationship with HAH—supports the testimony of OHC representatives. The evidence reflects that Ogilvie and Upshaw never invested a combined $250,000 in cash or $50,000 worth of equipment into HAH, nor did they ever gain an ownership stake in the company. Although Ogilvie and Upshaw did invest some funds—significantly less than $250,000 in cash—into LL&T, an entity separate from HAH, this investment was

---

[2] OHC would need to prove, by clear and convincing evidence, that Ogilvie and Upshaw's committed fraud "consciously or deliberately" in order to be awarded punitive damages. Ala. Code § 6-11-20. However, even if these elements are met, an award of punitive damages is not required. *See id.* The Court declines to award punitive damages in this case, making any consideration of whether OHC proved fraud by clear and convincing evidence unnecessary.

7

contrary to the representations made by Ogilvie and Upshaw to OHC. Accordingly, OHC established the first element of its fraud claim.

B. Material Fact

Ogilvie and Upshaw's false representations during the June 27, 2018 meeting went to a material existing fact: the viability of HAH's business. "A 'material fact' is a fact that will induce action or inaction by the other party." *Ex parte Dial Kennels of Ala., Inc.*, 771 So. 2d 419, 421 (Ala. 1999). The purpose of the June 27, 2018 meeting at the Stagecoach Inn was for Luckett Robinson, OHC's chief credit decisionmaker, to determine the size and nature of the equity investment purportedly made by Ogilvie and Upshaw in HAH. In turn, Luckett Robinson could gauge the risk of extending HAH's line of credit. Luckett Robinson had previously expressed concerns that HAH lacked sufficient capital and management depth. Pl.'s Ex. 2. Ogilvie and Upshaw's false representation about their involvement with HAH went to those concerns, and induced OHC to extend HAH's line of credit.[3] In a meeting to gauge the creditworthiness of a business, a purported partner's investment and ownership

---

[3] Whether Ogilvie and Upshaw knew about Luckett Robinson's intentions in setting up the meeting is irrelevant in determining whether their misrepresentations were material. *See Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1091 (Ala. 2007) ("[A]n innocent misrepresentation is as much a legal fraud as an intended misrepresentation and the good faith of a party in making what proves to be a material misrepresentation is immaterial as to the question whether there was an actionable fraud if the other party acted on the misrepresentation to his detriment." (quoting *Smith v. Reynolds Metals Co.,* 497 So.2d 93, 95 (Ala. 1986)).

status is a material fact. Accordingly, OHC established the second element of its fraud claim.

C. Reasonable Reliance

OHC reasonably relied on Ogilvie and Upshaw's false representation of material fact in extending HAH's line of credit. To recover on its fraud claim, OHC must prove that it reasonably relied on Ogilvie and Upshaw's misrepresentation. *See Alfa Life Ins. Corp. v. Green*, 881 So. 2d 987, 991 (Ala. 2003) (per curiam). This standard imposes on OHC a " 'general duty . . . to read the documents received in connection with a particular transaction,' together with a duty to inquire and investigate." *See AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008) (citations omitted) (quoting *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997)). "Fraud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered." *Id.* (quoting *Gonzales v. U–J Chevrolet Co.*, 451 So. 2d 244, 247 (Ala. 1984)). "The 'reasonable reliance' standard . . . will allow the factfinder [to] determin[e] the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Foremost*, 693 So. 2d at 421.

Here, Ogilvie and Upshaw made definite statements about their capital contributions to HAH in response to Luckett Robinson's direct inquiry, allowing OHC to reasonably rely on these oral statements. Further, Ogilvie and Upshaw's statements were supported by their later representations. While HAH was frequently late in making payments to OHC prior to the credit extension, this practice is common in the lumber business. HAH's late payments to OHC do not to make OHC's reliance on Ogilvie and Upshaw's direct, unequivocal statements of investment and partial ownership unreasonable.[4] OHC did not ignore any written contract terms in relying on Ogilvie and Upshaw's representations. Also, OHC did not blindly trust Ogilvie and Upshaw: Luckett Robinson personally met the pair, visited the HAH facility several times, and reviewed financial information provided by David Hogan. (Doc. 110, PageID.983); Pl.'s Ex. 3. This level of diligence goes beyond the level of inquiry required for OHC to reasonably rely on Ogilvie and Upshaw's unequivocal representations, even when considering Luckett Robinson's legal education and business sophistication. *See Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC*, 615 F. Supp. 2d 1296, 1307 (S.D. Ala. 2009) ("The court is unaware of any Alabama authority that supports the broad legal rule . . . that parties to an arm's-length relationship must conduct due diligence before they can reasonably rely on representations made on the opposite side of the negotiating table."). Accordingly, OHC established the third element of its fraud claim.

---

[4] Upshaw even provided an explanation for the late payments in a subsequent email to Luckett Robinson (Doc. 110, PageID.1009–10), mitigating OHC's potential concerns about HAH's exact relationship with Ogilvie and Upshaw.

10

D. Damages

As a proximate result of Ogilvie and Upshaw's misrepresentations, HAH made additional credit purchases from OHC which would ultimately be left unpaid. After the parties met at the Stagecoach Inn on June 27, 2018, OHC sold HAH an additional $276,215.28 in inventory before terminating sales on September 6, 2018. Pl.'s Ex. 31. Luckett Robinson testified that if not for Ogilvie and Upshaw's representations about their investment and involvement in HAH, OHC would not have changed its credit terms with HAH. In other words, but for Ogilvie and Upshaw's misrepresentations, OHC would not have lost another $276,215.28 in inventory to HAH. Ogilvie and Upshaw falsely represented that they injected a significant amount of capital into HAH while, in reality, they were using a series of corporations to partiton their more limited capital contributions from HAH's assets due to its distressed financial condition. HAH's subsequent collapse and delinquency in its obligations to OHC, while foreseeable to Ogilvie and Upshaw, were obfuscated by the pair's false representations to OHC at the June 27, 2018 meeting. Accordingly, OHC established the fourth element of its fraud claim.

E. Ogilvie and Upshaw's Defenses

Ogilvie and Upshaw offer three primary defenses to OHC's fraud claim: (1) OHC did not rely on their statements; (2) if OHC did rely on their statements, its reliance was unreasonable; and (3) if Ogilvie and Upshaw did make a representation, it was not false. These arguments fail.

Ogilvie and Upshaw argue that OHC did not rely on any statements they made in deciding to extend its line of credit to HAH; rather, OHC made this decision before the June 27, 2018 meeting. In support, Ogilvie and Upshaw point to OHC's increase in credit sales to HAH starting in June 2018 prior to the June 27, 2018 meeting. However, this argument frames OHC's credit decision too narrowly. While OHC sold lumber to HAH on credit before meeting Ogilvie and Upshaw, Luckett Robinson credibly testified that he needed to meet HAH's purported equity partners face-to-face to clarify their investment before *continuing* to make credit sales to the company. (Doc. 110, PageID.997–998). Even if OHC decided to allow HAH to make larger credit purchases prior to the June 27, 2018 meeting, Luckett Robinson made clear that the continued existence of that arrangement depended on Ogilvie and Upshaw's representations. (Doc. 110, PageID.994). Luckett Robinson testified that if Ogilvie and Upshaw had revealed the true nature of their investment and ownership interest in HAH, OHC would have discontinued making credit sales. Whether OHC extended HAH's line of credit before the June 27, 2018 meeting is irrelevant because the fraud claim focuses on continuing those terms as a result of Ogilvie and Upshaw's representations.

Next, Ogilvie and Upshaw contend that if OHC did rely on statements they made at the June 27, 2018 meeting, its reliance was unreasonable. Given Luckett Robinson's legal experience and sophistication, Ogilvie and Upshaw argue that merely relying on oral statements made over a brief lunch meeting in making a credit decision is unreasonable. Ogilvie and Upshaw emphasize that OHC never checked

12

their credit, requested financial information, or asked for the documents setting out the relationship between the pair and HAH. However, Ogilvie and Upshaw fail to cite any precedent demonstrating that under Alabama law, a party must seek out evidence to verify an unequivocal statement made in an arms-length transaction. A similar case from this district found a dearth of precedent to support a requirement of additional due diligence to verify clear—yet ultimately fraudulent—representations. *See Parsons & Whittemore Enterprises Corp.*, 615 F. Supp. 2d at 1307. Further, Ogilvie and Upshaw's argument ignores the role that their continued representations of affiliation with HAH and failure to correct misleading representations may have had in mitigating concerns OHC had about the precise nature of their relationship. *See supra*, Section III.C. Finally, OHC did not rely solely on Ogilvie and Upshaw's representations at the June 27, 2018 meeting: Luckett Robinson previously reviewed HAH's financial information and visited its facility. *See supra*, Section III.C.[5]

Ogilvie and Upshaw also argue that if they did make representations about a specific investment in HAH during the June 27, 2018 meeting, these representations lined up with their actual investment into HAH. In support, Ogilvie and Upshaw

---

[5] Ogilvie and Upshaw argue that given Luckett Robinson's legal background, he should have been familiar with the need for their purported investment to be memorialized in writing. By not seeking out this writing, Ogilvie and Upshaw contend that any reliance on their representations is unreasonable. The Court declines to find that OHC needed to inquire about the specific structure of Ogilvie and Upshaw's relationship with HAH given their direct, unequivocal representations about an investment and ownership interest in the company made at the June 27, 2018 meeting.

13

point to their $40,000 contribution to HAH by way of BOBU Holdings, LLC into LL&T, as well as their contributions in the form of in-kind services and personal guarantees on loans issued to HAH. (Doc. 111, PageID.1290; Doc. 111, PageID.1349). However, these contributions stand in stark contrast to the unequivocal representations made by Ogilvie and Upshaw at the June 27, 2018 meeting. In response to Luckett Robinson's direct inquiry, Ogilvie and Upshaw claimed to have invested a combined $250,000 into HAH in addition to $50,000 worth of equipment. (Doc. 110, PageID.995). The actual combination of $40,000 and non-cash benefits afforded to HAH by Ogilvie and Upshaw through a shifting screen of corporations cannot be reasonably construed as substantial compliance with the representations made at the June 27, 2018 meeting.

## IV. Conclusion

In accordance with the foregoing analysis, the Court finds in favor of Plaintiff Overseas Hardwood Company, Inc., and against Defendants Brent Upshaw and Blake Ogilvie, on the fraud claim asserted in the complaint in the following amount: Brent Upshaw and Blake Ogilvie are jointly and severally liable for compensatory damages to OHC in the amount of $276,215.28,[6] along with post judgment interest

---

[6] "Damages are not apportioned among joint tort-feasors in Alabama; instead, joint tort-feasors are jointly and severally liable for the entire amount of damages awarded." *Matkin v. Smith,* 643 So. 2d 949, 951 (Ala. 1994) (citing *Buchanan v. Collier,* 555 So.2d 134 (Ala. 1989)).

at the rate set by 28 U.S.C. § 1961. Judgment will be entered separately pursuant

Federal Rule of Civil Procedure 58.

**DONE** and **ORDERED** this the 16th day of March 2021.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

15